IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division

UNITED STATES OF AMERICA,

v.                                              Criminal Case No. 3:23cr40-1

JEREMY BLUE,

      Defendant.

## MEMORANDUM OPINION

This matter comes before the Court on Defendant Jeremy Blue's Amended Motion to Suppress (the "Motion"). (ECF No. 38.) Mr. Blue seeks to suppress evidence—specifically, fentanyl pills and powder containing fentanyl—that law enforcement recovered from his apartment and his girlfriend's mother's apartment on September 28, 2022. (ECF No. 38, at 1; ECF No. 38-1, at 1; Oct. 5 Tr. 13:14–20, 14:8–12, 17:8–18.) Mr. Blue contends that the officers obtained the evidence pursuant to two unlawful searches in violation of the Fourth Amendment of the United States Constitution.[1] (ECF No. 38, at 1.)

The United States responded in opposition, and Mr. Blue replied. (ECF Nos. 45, 46.) On October 5, 2023, the Court heard evidence and oral argument, after which the Court took the matter under advisement.

---

[1] The Fourth Amendment states:

> The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

U.S. Const. amend. IV.

This matter is ripe for disposition. For the reasons that follow, the Court will deny the Motion. (ECF No. 38.)

## I. Procedural History and Findings of Fact

### A.   Procedural History

A grand jury indicted Mr. Blue on April 5, 2023, charging him with Conspiracy to Distribute Cocaine, in violation of 21 U.S.C. §§ 846 and 841(a)(1) ("Count I"); Possession with the Intent to Distribute Cocaine and Fentanyl, in violation of 21 U.S.C. § 841(a)(1) ("Count II"); and Possession of a Firearm and Ammunition by a Convicted Felon, in violation of 18 U.S.C. § 922(g)(1) ("Count III"). (ECF No. 1, at 1–2.)

On May 24, 2023, Blue timely filed a Motion to Suppress. (ECF No. 25.) The United States responded, and Blue replied. (ECF Nos. 32, 33.) Because Mr. Blue presented "new arguments and objections to additional evidence" in his reply brief, the United States asked the Court for leave to file a sur-reply. (ECF No. 34, at 1.) The Court denied the United States' request, and instead, denied without prejudice the Motion to Suppress, (ECF No. 25), and ordered rebriefing. (ECF No. 35, at 1.)

On July 12, 2023, Mr. Blue filed his Amended Motion to Suppress. (ECF No. 38.) The United States responded, and Blue replied. (ECF Nos. 45, 46.) On October 5, 2023, the Court held a hearing on the Amended Motion to Suppress. For the reasons articulated below, the Court will deny the Motion. (ECF No. 38.)

**B.**   **Findings of Fact**

    **1.**   **Facts Stated in the Search Warrant**

The September 28, 2022 sworn Affidavit for Search Warrant (the "affidavit" or "search warrant" or "warrant") requests a search in relation to (1) "[d]istribution of a controlled substance (VA Code 18.2-248)" and (2) "[c]onspiracy to distribute a controlled substance (VA Code 18.2-256)." (ECF No. 38-3, at 1.)[2] The warrant describes the items to be searched for as "drugs and drug paraphernalia" as well as "items of constructive possession and other items associated with the drug trade." (ECF No. 38-3, at 1.)

The warrant defines the place to be searched as "302 Newbridge Road, Apartment 92, in Henrico County, Virginia" ("Blue's Shared Apartment" or "Shared Apartment"). (ECF No. 38–3, at 1.) The warrant provides multiple facts signifying that this address is Mr. Jeremy Blue and Ms. Fiera Hicks's residence. (ECF No. 38–3, at 3–4.) For example, the warrant states that databases indicate Hicks resides "at 302 Newbridge Road, Apartment 92 in Henrico County", and Ms. Hicks stated to law enforcement, after being read her *Miranda* rights on September 27, 2022—the day before the affidavit was sworn—that "she lives at 302 Newbridge Road Apartment 92" and Blue is "her baby's father" who "stays with her at Newbridge Road to help take care of [her] children." (ECF No. 38–3, at 3.)

---

[2] Neither Mr. Blue nor the United States introduced the search warrant or its accompanying affidavit as an exhibit at the October 5, 2023 hearing. However, Mr. Blue filed the search warrant, along with its accompanying affidavit, as an exhibit to the Amended Motion to Suppress. (ECF No. 38-3.)

The warrant includes a sworn accompanying affidavit.[3]  (ECF No. 38-3, at 2.)  The affiant, Richmond DEA Task Force Agent Detective Arrington, states that he "has arrested and been involved in the investigations and arrests of hundreds of cocaine traffickers."  (ECF No. 38-3, at 5.)  The affidavit further reports that "Detective Arrington has been working narcotics cases for the last eight years", "has testified in multiple Circuit Courts in the state of Virginia as an expert witness in the subject matter of narcotics trafficking and distribution", "has executed numerous drug search warrants for residences", and "has made numerous misdemeanor and felony drug arrests as a result of these search warrants."  (ECF No. 38-3, at 5.)  Detective Arrington states in the affidavit that based on his experience, "[d]rug traffickers not only store their drug proceeds, drugs, and items to distribute their drugs at their residences, but also at secondary storage locations."  (ECF No. 38-3, at 5.)  Additionally, Detective Arrington declares that "[d]rug traffickers commonly use safes to store drugs and drug proceeds in their residences and stash locations."  (ECF No. 38-3, at 5.)

On September 27, 2022, Mr. Blue was arrested for drug-related crimes.  (ECF No. 38-3, at 3.)  The affidavit first chronicles the investigation leading up to the arrest.  It explains that law enforcement learned from a confidential source ("CS") "that an[] individual would have a quantity of cocaine in their vehicle", which the CS described as "a white Lexus SUV."  (ECF No. 38-3, at 3.)  The affidavit further conveys that "[d]uring this time frame, surveillance units observed a white Lexus SUV with Virginia license plate TZM-5684 in the area they expected to

---

[3] A "presumption of validity" exists "with respect to the affidavit supporting the search warrant." *Franks v. Delaware*, 438 U.S. 154, 171 (1978).  Because Blue does not allege that the statements in the affidavit supporting the search warrant are untrue statements, but instead says that these statements do not provide enough information or that they do not contain the proper information to support the search warrant, the Court in part makes its findings of fact based on the statements made in the affidavit. *Id.*

find the subject with cocaine", and the vehicle was "registered to Fiera Hicks." (ECF No. 38-3, at 3.) Detective Arrington recounts that, "just prior to Blue's arrest", Mr. Blue was "observed getting into the passenger seat of the White Lexus in Whitcomb Court[,] . . . pulling a white grocery bag from under the passenger seat and opening it and appearing to inspect it." (ECF No. 38-3, at 4.) The affidavit does not describe any prior law enforcement surveillance of Mr. Blue's Shared Apartment or his apartment building.

The affidavit then describes Mr. Blue's September 27, 2022 arrest and immediate aftermath. The affidavit notes that law enforcement detained the white Lexus "in a Wendy's parking lot in Chesterfield County" with Ms. Hicks "in the driver seat and [Blue] in the front passenger seat." (ECF No. 38-3, at 3.) In the vehicle occupied by both Ms. Hicks and Mr. Blue, law enforcement discovered cocaine, heroin, $7,090 in cash in rubber banded bundles, and a handgun. (ECF No. 38-3, at 3.)

The affidavit then imparts the contents of law enforcement's September 27, 2022 interview with a source of information ("SOI"). After Mr. Blue was arrested that day, the SOI told law enforcement that Blue lives with Ms. Hicks "at the Newbridge apartments", and that the SOI "frequently" sees Blue and Hicks together when Blue is selling narcotics in Whitcomb Court. (ECF No. 38-3, at 4.) The SOI further informed law enforcement that they believed that Blue was "coming from Newbridge prior to arriving in Whitcomb [Court] to sell narcotics." (ECF No. 38-3, at 4.)

The affidavit also conveys information supporting the SOI's credibility. First, the affidavit states that the SOI reported that they had seen Blue leaving Whitcomb Court with a black bag. (ECF No. 38-3, at 4.) The affidavit provides that "Blue was arrested with a black bag containing smaller amounts of suspected heroin and cocaine." (ECF No. 38-3, at 4.)

Additionally, "[t]he SOI stated that Blue obtains his narcotics from [redacted] and traveled with [redacted] to a football game in Florida in the past few days." (ECF No. 38-3, at 4 (redaction in original)). Detective Arrington explains that "[t]his information further . . . establish[ed] [the SOI's] credibility" because Detective Arrington knows [redacted] based on this investigation and knows that [redacted] was at a NFL game in Tampa Bay, Florida in the last few days." (ECF No. 38-3, at 4 (redaction in original).) Detective Arrington reports in the affidavit that the SOI "has been proven credible through facts and information he/she has provided." (ECF No. 38-3, at 4.)

Detective Arrington concludes that "[b]ased on the totality of the circumstances, [he] strongly believes that [Blue] is storing and distributing kilogram quantities of cocaine in conjunction with [Hicks] and that there is evidence of their drug trafficking at [Blue's Shared Apartment]" on Newbridge Road in Henrico County. (ECF No. 38-3, at 4.)

A Virginia magistrate approved the warrant, which was signed and executed on September 28, 2022. (ECF No. 38-3, at 1.)

### 2. Searches Conducted as a Result of the Warrant

The day after the arrest, on September 28, 2022, law enforcement searched Mr. Blue's Shared Apartment pursuant to the warrant. (Oct. 5 Tr. 12:17–13:2, 28:17–19.) During the search, law enforcement recovered 61 fentanyl pills from the residence. (Oct. 5 Tr. 13:14–20, 34:14–15.) After law enforcement executed the search warrant, law enforcement read Ms. Hicks her *Miranda* rights and then interviewed her. (Oct. 5 Tr. 13:21–23.) During the interview, Hicks indicated that there were additional narcotics at her mother's apartment (the "Second Apartment"). (Oct. 5 Tr. 13:24–14:3.) That same day, law enforcement received consent from Ms. Hicks's mother to search the Second Apartment for narcotics. (Oct. 5 Tr. 14:4–12, 22:24–

23:10, 28:19–21.)   Law enforcement searched the Second Apartment and seized the following items: (1) approximately 1.5 kilograms of narcotics that later tested positive for fentanyl; and (2) "almost 890 . . . pressed M30 pills, which were later identified as fentanyl." (Oct. 5 Tr. 14:8–12, 17:8–18.)

## II.  Analysis

Mr. Blue seeks to suppress evidence obtained from the search of Blue's Shared Apartment and the Second Apartment, contending that both searches were unlawful.[4] (ECF No. 38, at 1.)  As the party seeking suppression, Mr. Blue bears the burden of establishing that suppression is proper. *United States v. Vasquez*, 604 F. Supp. 3d 330, 334 (E.D. Va. 2022). Despite the Court's concerns about the limited nexus between Mr. Blue's alleged drug trafficking, Blue's Shared Apartment, and items to be seized pursuant to the warrant, the Court will deny Mr. Blue's Amended Motion to Suppress. (ECF No. 38.)  Regardless of whether a sufficient nexus existed between the alleged crime and Blue's Shared Apartment to support a finding of probable cause, the warrant is valid under the good-faith exception. *See United States*

---

[4] In its briefing, the United States asserts that it "has not charged, nor does it intend to introduce in its case in chief at trial against [Blue], the evidence seized pursuant to [the warrant] or the evidence obtained later on September 28, 2022, from Ms. Hicks's mother's residence with the consent of Hicks's mother." (ECF No. 45, at 2 (citing the Indictment, ECF No. 1).) The United States reaffirmed this intention at the October 5, 2023 hearing. (Oct. 5 Tr. 3:18–22.)

Mr. Blue contends, however, that law enforcement unlawfully seized evidence from both apartments "with an eye towards enhancing Mr. Blue's sentenc[e]" the day after law enforcement recovered from a vehicle occupied by both Ms. Hicks and Mr. Blue approximately one kilogram of cocaine, a quantity of fentanyl mixture, and a firearm. (Oct. 5 Tr. 27:4–8, 17–18; ECF No. 38-3, at 3.)  Thus, Mr. Blue argues, if the Court finds that either search was unlawful, the Court must also exclude the unlawfully obtained evidence for sentencing purposes. (Oct. Tr. 27:17–22, 41:4–22.)  Because the Court finds that both searches were lawful, this argument is now moot, and thus the Court does not reach the merits of this premature argument.

*v. Leon*, 468 U.S. 897, 925 (1984) (stating that a reviewing court may proceed to the good-faith exception without first deciding whether the warrant was supported by probable cause).

Also, even if the search of the Shared Apartment required suppression, Mr. Blue's lack of standing and the attenuation doctrine would require this Court to deny his motion to suppress any evidence seized from the Second Apartment.

### A.     It is Questionable Whether the Warrant Provided a Sufficient Nexus Between the Alleged Drug Trafficking and Blue's Shared Apartment as a Storage or Distribution Site

The Court finds that the warrant provides, at best, a minimal nexus between Blue's alleged drug trafficking, Mr. Blue's Shared Apartment, and items related to drug trafficking. Regardless of whether this is nevertheless sufficient to support a finding of probable cause, for the reasons discussed in Section III.B., *infra*, the Court concludes that the warrant is valid under the good-faith exception because the warrant was not so lacking in indicia of probable cause as to render law enforcement's reliance on the warrant "entirely unreasonable." *United States v. Seerden*, 916 F.3d 360, 367–68 (4th Cir. 2019); *see Leon*, 468 U.S. at 925 (stating that a reviewing court may proceed to the good-faith exception without first deciding whether the warrant was supported by probable cause.

### 1.     Legal Standard:  The Warrant Requirement

The Fourth Amendment prohibits the issuance of a warrant, unless that warrant is based "upon probable cause" and unless it "particularly describ[es] the place to be searched, and the persons or things to be seized." U.S. Const. amend. IV.  In other words, the Fourth Amendment requires that a warrant (1) be supported by probable cause; (2) particularly describe the place to be searched and the things to be seized; and (3) be issued by a neutral, disinterested magistrate. *Dalia v. United States*, 441 U.S. 238, 255 (1979) (internal quotations and citations omitted).  If a

warrant is invalid, the proper remedy in a criminal action is "ordinarily" to suppress the evidence derived from it. *United States v. Thomas*, 908 F.3d 68, 72 (4th Cir. 2018).

### i.     **Probable Cause**

After a magistrate has issued a search warrant, courts will review the decision "with great deference, asking only whether the judicial officer had a substantial basis for finding probable cause." *United States v. Blakeney*, 949 F.3d 851, 859 (4th Cir. 2020) (citations and internal quotation marks omitted). Such deference, however, "does not mean that warrants based on conclusory allegations should be upheld: 'Sufficient information must be presented to the magistrate to allow that official to determine probable cause; his [or her] action cannot be a mere ratification of the bare conclusions of others.'" *United States v. Wilhelm*, 80 F.3d 116, 119 (4th Cir. 1996) (quoting *Illinois v. Gates*, 462 U.S. 213, 239 (1983)). "When reviewing the probable cause supporting a warrant, a reviewing court must consider only the information presented to the magistrate who issued the warrant." *Wilhelm*, 80 F.3d at 118 (citing *United States v. Blackwood*, 913 F.2d 139, 142 (4th Cir. 1990)).

Whether the issuing judge had a substantial basis for finding probable cause is reviewed under the totality of the circumstances. *United States v. May*, 446 F. App'x 652, 654 (4th Cir. 2011). When evaluating whether probable cause exists, the issuing magistrate may consider the reliability of a SOI or CS. *See United States v. Lalor*, 996 F.2d 1578, 1581 (4th Cir. 1993) ("Corroboration of apparently innocent details of an informant's report tends to indicate that other aspects of the report are also correct.") (citing *Gates*, 462 U.S. at 244). A law enforcement officer's statement that "based on his training and experience", contraband is likely to be found in a particular residence can also support a finding of probable cause. *See United States v. Williams*, 40 F. App'x 843, 845 (4th Cir. 2002) (citing *Gates*, 462 U.S. at 231–32); *Gates*, 462

9

U.S. at 231–32 (officers may make deductions, assess probabilities, and draw inferences based on their training and experience). "As always, the ultimate touchstone of the Fourth Amendment is reasonableness." *United States v. Cobb*, 970 F.3d 319, 327 (4th Cir. 2020), *as amended* (Aug. 17, 2020) (quoting *United States v. Lyles*, 910 F.3d 787, 791 (4th Cir. 2018) (further citations omitted)).

### ii.     Nexus Between the Alleged Criminal Conduct, Place to Be Searched, and the Items to be Seized

For a warrant to be supported by probable cause, a nexus among the alleged criminal conduct, the place to be searched, and the items to be seized must exist. *See United States v. Grossman*, 400 F.3d 212, 217 (4th Cir. 2005). This nexus can exist "even when the affidavit supporting the warrant 'contains no factual assertions directly linking the items sought'" to the place to be searched. *Grossman*, 400 F.3d at 217 (quoting *United States v. Servance*, 394 F.3d 222, 230 (4th Cir. 2005)). Simply put, the issuing magistrate is permitted to reach a reasonable, common-sense conclusion that evidence is likely to be found in a location, based on the "normal inferences" about where evidence may be kept. *United States v. Anderson*, 851 F.2d 727, 729 (4th Cir. 1988); *Williams*, 40 F. App'x at 845 (evidence of drug trafficking from the defendant's automobile offered probable cause for a warrant for the defendant's residence); *Grossman*, 400 F.3d at 217–18 (finding sufficient nexus between defendant's suspected drug activity and three residences to which he had access and in which he stayed from time to time, stating that "it is reasonable to suspect that a drug dealer stores drugs in a home to which he owns a key"); *United States v. Williams*, 548 F.3d 311, 319 (4th Cir. 2008) (observing that the Fourth Circuit has consistently "upheld warrants to search suspects' residences and even temporary abodes" where there was "(1) evidence of the suspects' involvement in drug trafficking combined with (2) the

reasonable suspicion (whether explicitly articulated by the applying officer or implicitly arrived at by the magistrate judge) that drug traffickers store drug-related evidence in their homes").

In the absence of factual assertions directly linking the items sought to the place to be searched, "probable cause can be inferred from the circumstances." *Lalor*, 996 F.2d at 1582 (citing *Anderson*, 851 F.2d at 729). A warrant is not automatically invalid where it fails to produce "direct evidence that the items to be seized will be found at a particular location." *Id.* (citations omitted); *see Anderson*, 851 F.2d at 729 (finding probable cause to search residence for pistol and silencer attachment even though the affidavit contained no facts that these items were located at the residence); *United States v. Williams*, 974 F.2d 480, 481–82 (4th Cir. 1992) (per curiam) (finding probable cause to search motel room based on reasonable inference by magistrate that "drug paraphernalia would be found in the motel room of a known drug dealer").

Where an affidavit fails to link the relevant criminal conduct to the defendant's residence, the warrant is not supported by probable cause. For example, in *Lalor*, the warrant was not supported by probable cause where its accompanying affidavit was "devoid of any basis from which the magistrate could infer that evidence of drug activity would be found at [the residence]", where the affidavit "[did] not describe circumstances that indicate such evidence was likely to be stored at [defendant's] residence" and did not "explain the geographic relationship between the area where the drug sales occurred and [the residence]." 996 F.2d at 1582–83.

## 2. It is Questionable Whether the Warrant Provided a Sufficient Nexus Between the Alleged Drug Trafficking and Blue's Shared Apartment as a Storage or Distribution Site

The Court notes its concern that the warrant establishes, at best, only a minimal nexus between the alleged criminal conduct and Blue's Shared Apartment. The warrant provides: (1)

that a SOI *believed* that Blue was "coming from Newbridge prior to arriving in Whitcomb

[Court] to sell narcotics"; (2) the SOI provided other information about Blue and another

purported drug trafficker that law enforcement was able to independently corroborate; (3)

Detective Arrington stated that the SOI "has been proven credible"; (4) that based on Detective

Arrington's experience, "[d]rug traffickers . . . store their proceeds, drugs, and items to distribute

their drugs" at both their residences and at secondary storage locations; (5) that Mr. Blue resides

at 302 Newbridge Road, Apartment 92, in Henrico County, Virginia; and (6) that Detective

Arrington "strongly" believed that, "[b]ased on the totality of the circumstances[,] . . . there is

evidence of [Blue's] drug trafficking at [Blue's Shared Apartment]", i.e., 302 Newbridge Road,

Apartment 92, Henrico County, Virginia. (ECF No. 38-3, at 5.)

 First, it does not appear that law enforcement conducted any independent investigation

confirming that Mr. Blue used the Shared Apartment—where he lived with his child—as a place

to store or distribute contraband. Nor does the affidavit address why, when Ms. Hicks had

access to the Shared Apartment overnight, any contraband would be there *the day after* Ms.

Hicks and Mr. Blue were in a car from which law enforcement seized approximately one

kilogram of powder cocaine, a quantity of fentanyl mixture, and a firearm. (ECF No. 38-3, at 3.)

Second, the affidavit does not explicitly provide that the SOI believed that Blue was storing

drugs in Blue's Shared Apartment, but only that the SOI *believed* that Blue was "*coming from*

*Newbridge* prior to arriving in Whitcomb [Court] to sell narcotics." (ECF No. 38-3, at 4

(emphasis added).) Thus, even though the SOI provided other information that was

corroborated,[5] and even though "[c]orroboration of apparently innocent details of an informant's

---

[5] The SOI provided the following statements that law enforcement independently corroborated:  (1) that Blue lives with Hicks "at the Newbridge apartments"; (2) that Blue carries

12

report tends to indicate that other aspects of the report are also correct", the SOI does not *necessarily* link Mr. Blue's Shared Apartment to his criminal activity. *See Lalor*, 996 F.2d at 1581. Detective Arrington's expertise filled that gap. Even given the proper acknowledgement of Detective Arrington's training and experience, it is questionable whether the warrant shows the appropriate nexus between Mr. Blue's alleged drug trafficking and the use of his Shared Apartment as a storage or distribution site to allow a magistrate to infer that evidence of drug activity would be found at Blue's Shared Apartment on Newbridge Road the day after his arrest for possessing approximately one kilogram of cocaine, a quantity of fentanyl mixture, and a firearm. *See id.* at 1582–83.

### B.   Law Enforcement Relied on the Warrant in Objectively Reasonable Good Faith

Regardless of whether the warrant was supported by probable cause, the Court finds that that the warrant was not so lacking in indicia of probable cause as to render law enforcement's reliance on the warrant "entirely unreasonable." *Seerden*, 916 F.3d at 367–68. Accordingly, the Court holds that the good-faith exception to the exclusionary rule applies to evidence obtained through the warrant. *See id.* at 368.

### 1.   Legal Standard:  The Good-Faith Exception

Even if a search warrant was not supported by probable cause, "the evidence obtained will not be suppressed if the executing officer relied on the warrant in objectively reasonable good faith." *Blakeney*, 949 F.3d at 859 (citing *Leon*, 468 U.S. at 922–23). A finding of good faith can be supported when a neutral, detached magistrate approved the search. *Messerschmidt v. Millender*, 565 U.S. 535, 546 (2012). "Under *Leon*, the proper test of an officer's good faith is

a black bag; and (3) that the person the SOI identified as Blue's narcotics supplier had recently travelled to a football game in Florida. (ECF No. 38-3, at 4.)

'whether a reasonably well trained officer would have known that the search was illegal despite the magistrate's authorization.'" *United States v. Hyppolite*, 65 F.3d 1151, 1156 (4th Cir. 1995) (quoting *Leon*, 468 U.S. at 922 n.23); *see Seerden*, 916 F.3d at 367 (good-faith exception applied where affidavit was sufficiently detailed such that "it would not be entirely unreasonable for an officer to believe that the [search] was supported by probable cause."); *Lalor*, 996 F.2d at 1582–83 (good-faith exception applied even where warrant application "fail[ed] to establish a nexus between the drug activity and the location that was searched" and was "devoid of any basis from which the magistrate could infer that evidence of drug activity would be found at" residence).

The good-faith exception would not apply in the following circumstances: (1) where the issuing magistrate "was misled by information in an affidavit that the affiant knew was false or would have known was false except for his [or her] reckless disregard of the truth"; (2) "where the issuing magistrate wholly abandoned his [or her] judicial role"; (3) where "a warrant based on an affidavit is 'so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable'"; and (4) where the warrant is "so facially deficient—i.e., in failing to particularize the place to be searched or the things to be seized—that the executing officers cannot reasonably presume it to be valid." *Leon*, 468 U.S. at 923 (citations omitted).

A magistrate does not wholly abandon his or her judicial role "simply because the warrant was insufficient." *United States v. Andrews*, 577 F.3d 231, 240, 236 (4th Cir. 2009).

"The threshold for establishing" that the good-faith exception does not apply because the warrant at-issue "was so lacking in indicia of probable cause . . . 'is a high one.'" *Seerden*, 916 F.3d at 367 (quoting *Messerschmidt*, 565 U.S. 535 at 547) (observing that "[o]fficers executing warrants are not often expected to question the conclusions of an issuing authority").

14

**2.   Law Enforcement Relied on the Warrant in Objectively Reasonable
       Good Faith**

Mr. Blue provides two arguments that he says establish that the good-faith exception does

not apply here.  First, he argues that the good-faith exception should not apply because the

issuing magistrate "wholly abandoned her detached and neutral judicial role" "by simply

ratifying" Detective Arrington's conclusions.  (ECF No. 38, at 11; see also Oct. 5 Tr. 26:2–6.)

Second, he argues that "the warrant was based on [an a]ffidavit that was so lacking in indicia of

probable cause as to render official belief in its existence entirely unreasonable." (ECF No. 38,

at 11; *see also* Oct. 5 Tr. 26:2–8.)  Because Mr. Blue has failed to identify "any specific

instances demonstrating that the issuing magistrate was not neutral or detached", Blue's first

argument "[e]ssentially . . . recasts" his second argument. *See Andrews*, 577 F.3d at 240.

Accordingly, the analysis for both arguments collapses into one—whether the warrant was so

lacking in indicia of probable cause that the officer's reliance on the warrant was entirely

unreasonable. *See id.*

Specifically, Mr. Blue contends that "the detective was reckless in attesting in [the

warrant's accompanying affidavit that] he strongly believed there was going to be evidence of

drug trafficking at the defendant's residence." (ECF No. 38, at 10.)  Blue argues that this

attestation was reckless because "no independent evidence supported that notion other than the

informant's belief [that Blue was coming from Newbridge Road prior to arriving in Whitcomb to

sell narcotics] . . . and the detective's knowledge of drug traffickers in general from his

experiences as a narcotics officer." (ECF No. 38, at 10–11.)  Blue also argues that

"[a]lternatively, the detective could not have harbored an objectively reasonable belief in the

existence of probable cause that items of drug trafficking were going to be found at the

defendant's particular residence based on his and the informant's subjective beliefs." (ECF No. 38, at 11.)

Even if the Court were to presume that the warrant lacked probable cause, it was not "*so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable.*" *Leon*, 468 U.S. at 923 (emphasis added). There are at least five observations that support this finding. First, Ms. Hicks stated to law enforcement after her September 27, 2022 arrest the day before the search, and after being read her *Miranda* rights, that "she live[d] at 302 Newbridge Road Apartment 92" and Blue is "her baby's father" who "stays with her at Newbridge Road to help take care of [her] children." (ECF No. 38–3, at 3.) Second, the SOI reported that Mr. Blue lived with Ms. Hicks "at the Newbridge apartments." (ECF No. 38-3, at 4.) Third, the SOI stated that they "believed" Blue was coming from Newbridge Road when selling drugs in Whitcomb. (ECF No. 38-3, at 4). Detective Arrington concluded that the SOI was "credible and reliable" because the SOI provided statements that law enforcement was able to independently corroborate. (ECF No. 38-3, at 5). Specifically, the SOI provided the following statements that law enforcement independently corroborated: (1) that Mr. Blue lived with Ms. Hicks "at the Newbridge apartments"; (2) that Mr. Blue carried a black bag; and (3) that the person the SOI identified as Mr. Blue's narcotics supplier had recently travelled to a football game in Florida. (ECF No. 38-3, at 4); *see Lalor*, 996 F.2d at 1581 ("Corroboration of apparently innocent details of an informant's report tends to indicate that other aspects of the report are also correct.") (citing *Gates*, 462 U.S. at 244). Fourth, the affidavit that supported the warrant also includes a trained and experienced law enforcement officer's deduction that Mr. Blue, like other drug traffickers, was likely storing drugs in his 302 Newbridge Road apartment. (ECF No. 38-3, at 4.) Detective Arrington swore as to his eight years of experience investigating

drug trafficking and his involvement in the arrests of hundreds of drug traffickers. (ECF No. 38-3, at 5.) Courts have consistently observed that a law enforcement officer's statement that "based on his [or her] training and experience", contraband is likely to be found in a particular residence can support a finding of probable cause. *See Williams*, 40 F.App'x at 845 (citation omitted); *Gates*, 462 U.S. at 231–32 (officers may make deductions, assess probabilities, and draw inferences based on their training and experience); *see also Williams*, 548 F.3d at 319 (observing that the Fourth Circuit has consistently "upheld warrants to search suspects' residences and even temporary abodes" where there was "(1) evidence of the suspects' involvement in drug trafficking" and "(2) [] reasonable suspicion (whether explicitly articulated by the applying officer or implicitly arrived at by the magistrate judge) that drug traffickers store drug-related evidence in their homes").

Fifth and finally, a neutral and detached magistrate signed the warrant and no allegation exists that the facts in the warrant are false or intentionally misleading. *Messerschmidt*, 565 U.S. at 547 (observing that "[o]fficers executing warrants are not often expected to question the conclusions of an issuing authority").   While magistrate approval alone cannot and should not mechanically trigger the good-faith exception, a review of all five rationale as a whole establishes that law enforcement's reliance on the magistrate-reviewed, detailed warrant was not "entirely unreasonable." *Leon*, 468 U.S. at 923.  As a result, the good-faith exception applies. *See id.*

### C. Evidence Discovered From the Consent Search of the Second Apartment is Admissible Against Blue

As a threshold matter, Mr. Blue does not have standing to contest the search of the Second Apartment because he had no reasonable expectation of privacy in the Second

17

Apartment.[6] Blue does not contend that he has a reasonable expectation of privacy in the Second Apartment. Rather, Mr. Blue's sole basis for objecting to the search of the Second Apartment is his contention that it was "fruit of the poisonous tree[7] of the defective warrant." (ECF No. 38, at 13; *see also* Oct. 5 Tr. 28:15–29:8.) Because the Court has concluded that the search of Blue's Shared Apartment was lawful, and because Blue has not shown that he had a reasonable expectation of privacy in the Second Apartment at the time of its search, "the inquiry ends without consideration of the merits of the search claim." *Ferebee*, 957 F.3d at 412.

However, even presuming the search of Mr. Blue's Shared Apartment were unlawful, Ms. Hicks's and her mother's voluntary interactions with law enforcement sufficiently attenuated the causal connection between the search of the Blue's Shared Apartment and the Second Apartment and thus purged whatever taint infected the search of the Second Apartment. Accordingly, evidence discovered from the search of the Second Apartment is admissible against Blue regardless of whether the search of Mr. Blue's Shared Apartment was lawful.

---

[6] "Fourth Amendment rights are personal rights that may not be asserted vicariously." *Rakas v. Illinois*, 439 U.S. 128, 133 (1978). To successfully challenge a search under the Fourth Amendment, a defendant must show that he or she has a reasonable expectation of privacy in the area to be searched. *Rawlings v. Kentucky*, 448 U.S. 98, 104 (1980). This requirement is a "threshold inquiry that is preliminary to and distinct from the question of whether a warrant was required." *United States v. Ferebee*, 957 F.3d 406, 412 (4th Cir. 2020). If a defendant fails to satisfy this requirement, "the inquiry ends without consideration of the merits of the search claim." *Id.*

[7] The "fruit of the poisonous tree" doctrine provides that where evidence is the product of an illegal search, and "the causal connection between the evidence and the illegal conduct is [not] attenuated", the evidence is inadmissible at trial. *See United States v. Gray,* 491 F.3d 138, 154 (4th Cir. 2007).

1.    **Legal Standard:  Attenuation Doctrine**

"The Supreme Court has authorized the admission of evidence that is the product of an

unlawful search or seizure so long as the connection between the unlawful conduct of the police

and the acquisition of the evidence is so attenuated as to purge the evidence of the primary taint."

*United States v. Howe*, 414 F. App'x 579, 581 (4th Cir. 2011); *see also United States v. Hoang*

*Anh Thi Duong,* 156 F. Supp. 2d 564 (E.D. Va. 2001).  Under the attenuation doctrine, the

United States "bears the burden of establishing admissibility."  *United States v. Belt*, 609 F.

App'x 745, 748 (4th Cir. 2015) (per curiam) (unpublished).

To "determine whether the taint of an illegal search has been purged", courts evaluate the

following three factors: "(1) the length of time between the illegal act and the seizure of

evidence; (2) whether there were intervening circumstances; and (3) the gravity, flagrancy, and

reason for the police misconduct."  *Howe*, 414 F. App'x at 581 (citing *United States v. Seidman*,

156 F.3d 542, 548 (4th Cir.1998)).  Evidence can be sufficiently attenuated even where only

some of the three *Seidman* factors weigh in favor of the United States.  *See, e.g.*, *Seidman,* 156

F.3d at 549 (tape-recorded conversation that was the product of an unlawful entry was

admissible even where the conversation occurred "[a]pproximately one minute" after the

unlawful entry); *Belt*, 609 F. App'x at 749 (evidence sufficiently attenuated from law

enforcement's initial entry into home even where first *Seidman* factor weighed against finding

attenuation).

For suppression under the fruit of the poisonous tree doctrine to be proper, "the nexus"

between the initial unlawful search and the second search "must be so direct that the application

of the exclusionary rule would have a real deterrent effect on the behavior of law enforcement

officers."  *Hoang Anh Thi Duong*, 156 F. Supp. 2d at 576.  "[I]f police discover the evidence

from a[] source independent from the illegal conduct, the evidence need not be excluded."

*United States v. Harris*, 175 F.3d 1017 (Table), 1999 WL 133134 at *1–2 (4th Cir. March 12, 1999) ((per curiam) (unpublished) (upholding denial of motion to suppress drugs located in car after illegal seizure where "canine sniff provided the requisite probable cause to obtain the search warrant and was an independent source from the illegal seizure of the vehicle")).

A person's willingness to engage with law enforcement after an unlawful entry or search constitutes an independent act of free will that strongly weighs in favor of finding attenuation. *See, e.g., Belt*, 609 F. App'x at 749 (appellant's willingness to engage with law enforcement after entry into his home was "an independent act of free will" that "severed [a]ppellant's statements from [law enforcement's] initial entry"); *Howe*, 414 F. App'x at 582 (observing that defendant's "voluntary consent to the search of his home was an intervening act of free will" that weighed in favor of finding attenuation).

### 2.   Even if the Court Were to Presume that the Search of Blue's Shared Apartment Was Unlawful, Intervening Circumstances Would Purge Whatever Taint Infected the Search of the Second Apartment

Mr. Blue's sole basis for objecting to the search of the Second Amendment is his contention that the search was "fruit of the poisonous tree of the defective warrant." (ECF No. 38, at 13; *see also* Oct. 5 Tr. 28:15–29:8.) He explains that "[w]hile on the scene" of the search of Mr. Blue's Shared Apartment, Hicks "implicated [the Second Apartment] within the same apartment complex as a place of storage for additional narcotics." (ECF No. 38, at 11; *see also* Oct. 5 Tr. 28:24–29:4, 29:14–19.) He further explains that "[i]n response to the law enforcement's expressed interest in searching [the Second Apartment], [Hicks] contacted her mother . . . and solicited her to return to [the Second Apartment]." (ECF No. 38, at 11; *see also* Oct. 5 Tr. 19:12–24, 22:17–23.) Later that same day, Ms. Hicks's mother returned to the Second

Apartment and consented to the search of the Second Apartment. (Oct. 5 Tr. 20:9–14, 22:17–23:22.)

Considering the relevant factors, even if the Court were to presume that the search of Blue's Shared Apartment was unlawful, the primary taint of the search of Mr. Blue's Shared Apartment is attenuated from the search of the Second Apartment.

The first *Seidman* factor—time—weighs in favor of neither party.[8]  Based on the facts presented, it is difficult to determine the exact amount of time between the search of Blue's Shared Apartment and the Second Apartment to assist in analyzing this factor.  It is clear that the searches of both apartments occurred on the same day, and that Ms. Hicks's mother had to return from somewhere to give consent for the second search in person. (Oct. 5 Tr. 13:6–14:6, 22:17–22; 28:16–21.)  While no bright line rule exists dictating what length of time would purge the taint of an illegal search, the Fourth Circuit has found that a period of a few hours may be enough. *See Howe*, 414 F. App'x at 582 (more than seven-hour time period between the time law enforcement illegally entered the property and when they requested consent to search weighed in favor of purging taint).  As neither party introduced evidence sufficient to determine the length of time that elapsed between the search of Blue's Shared Apartment and the search of the Second Apartment, this factor, even given the government's burden, weighs neither for nor against finding attenuation.[9]

---

[8] A lack of sufficient time separating the two searches might suggest evidence from the second search should be suppressed. *See Seidman*, 156 F.3d at 549.

[9] For the reasons discussed below, the Court finds that the second and third *Seidman* factors weigh in favor of finding attenuation.  Thus, even a finding that a short time elapsed between the two searches would not change the Court's conclusion that the primary taint of the search of Mr. Blue's Shared Apartment, if any, is attenuated from the search of the Second Apartment. *See, e.g., Seidman,* 156 F.3d at 549 (evidence sufficiently attenuated even where

The second *Seidman* factor—intervening circumstances—weighs strongly in favor of finding attenuation. Similar to the circumstances in *Seidman*, *Belt*, and *Howe*, Ms. Hicks and her mother voluntary engaged with law enforcement after law enforcement searched Mr. Blue's Shared Apartment. Both interactions constitute intervening acts of free will. *See Seidman*, 156 F.3d at 549; *Belt*, 609 F. App'x at 749; *Howe*, 414 F. App'x at 582; *see* Oct. 5 Tr. 13:10–13, 13:2–14:3 (establishing that law enforcement first read Ms. Hicks her *Miranda* rights before she informed law enforcement that additional drugs were in the Second Apartment); *see* Oct. 5 Tr. 23:7–10 (establishing that Ms. Hicks's mother gave consent for law enforcement to search the Second Apartment). Intervening acts of free will weigh strongly in favor of finding attenuation. *See Seidman*, 156 F.3d at 549 n.10 ("Consent has often been recognized as sufficient to waive Fourth Amendment rights . . . . We see no reason why it could not also sever the connection between an unlawful act and the acquisition of additional evidence.") (internal citation omitted); *see also Howe*, 414 F. App'x at 582. Thus, as in *Belt*, "any taint that may have existed was dispelled" after law enforcement's interactions with Hicks and her mother. 609 F. App'x at 749.

The third *Seidman* factor—purpose and flagrancy—also weighs in favor of finding attenuation. First, law enforcement "did not act with a flagrant disregard of the law." *Belt*, 609 F. App'x at 749 (citing *Brown v. Illinois*, 422 U.S. 590, 593 (1975) and *Wong Sun v. United States*, 371 U.S. 471, 474 (1963)) (observing that in *Brown*, "officers broke into apartment and held individual at gunpoint", and in *Wong Sun*, "officers broke open a door and placed individual under arrest and in handcuffs"). Here, law enforcement searched Mr. Blue's Shared Apartment

---

there was a "lack of a significant intervening period of time" between an unlawful entry into home and the product of the unlawful entry); *Belt*, 609 F. App'x at 749 (evidence sufficiently attenuated even where "[l]ittle time passed between" law enforcement's entry of home and law enforcement's interaction with appellant).

pursuant to a search warrant signed by a neutral and detached magistrate. The warrant was supported by an affidavit submitted by an experienced law enforcement officer and included information about Mr. Blue's purported drug trafficking from a credible SOI and CS. The police misconduct, if any, was neither flagrant nor offensive. No evidence of intimidation, coercion, or physical violence by any law enforcement officer exists. Thus, the third factor also weighs in favor of finding attenuation. *See Belt*, 609 F. App'x at 750 (third *Seidman* factor weighed in favor of attenuation, even where law enforcement's conduct left "much to be desired", where there was no evidence that law enforcement "intimidated or coerced [a]ppellant").

Considering these factors together, the Court concludes that Ms. Hicks's and her mother's voluntary interactions with law enforcement sufficiently attenuated the causal connection between the search of Blue's Shared Apartment and the Second Apartment. *See Belt*, 609 F. App'x at 749. These voluntary actions purged whatever taint, if any, infected the search of the Second Apartment. *Id.*

### III. Conclusion

For the foregoing reasons, the Court will DENY Mr. Blue's Amended Motion to Suppress. (ECF No. 38.)

An appropriate Order shall issue.

Date: 12/22/23
Richmond, Virginia

/s/
M. Hannah Lauck
United States District Judge